**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA,

v.

BYRON ALEXANDER,

        Defendant.

No. 1:16-CR-10072-MLW

**DEFENDANT BYRON ALEXANDER'S**
**SENTENCING MEMORANDUM**

## I.    INTRODUCTION

Byron Alexander has pled guilty to Possession of Cocaine Base with Intent to Distribute and Possession with Intent to Distribute and Distribution of Cocaine Base within 1000 feet of a Public Housing Facility, in violation of 21 U.S.C. §§ 841(a)(1) and 860.  The charges arise from his sale on December 1, 2015 of 1.7 grams of crack cocaine to a government informant for $180 and his arrest later that day with another 2.2 grams of crack cocaine in his possession.  Mr. Alexander was arraigned on April 11, 2016 and has been detained for the last 16 months.  Mr. Alexander respectfully seeks a sentence of time served, to be followed by the mandatory six years of supervised release pursuant to 21 U.S.C. § 860(a)(2), during which he requests a recommendation that he receive treatment for substance abuse and mental health issues as well as vocational training.

Mr. Alexander is 37 years old.  He grew up largely in housing projects in Boston.  He had the benefit of a mother, two sisters, and a half-brother who were positive role models, but also suffered serious physical abuse as a child at the hands of his father.  He spent the majority of his twenties incarcerated in the state prison system for crimes he committed as a seventeen-year old,

but after his release from prison in 2009 he made concerted efforts to find and keep employment

and help provide for his two children.  With the exception of one misdemeanor, non-drug-related

offense prior to this one, Mr. Alexander avoided any additional convictions in the seven years

following his release.  However, in the years after the death of his mother in 2013, he had

personal difficulties and failed to maintain employment, ultimately leading him to the cocaine

transaction to which he has pled guilty.   Mr. Alexander submits with this memorandum twelve

letters of support from family members and friends discussing his prospects for living a stable

and law-abiding life and asking the Court for an early release date.

The Sentencing Guidelines call for a term of incarceration of 24 – 30 months.  A sentence

of time served – the equivalent of an 18-month term of imprisonment with credit for good time --

appropriately accounts for the sentencing factors set forth in 18 U.S.C. §  3553(a), without being

greater than necessary given that this case involves a relatively modest drug transaction.  An 18-

month sentence also would avoid unwarranted disparities in sentencing.  As set forth in more

detail below and in Appendix A, most of the defendants arrested in the ATF sweep, including

defendants with criminal histories that include serious offenses and significant periods of

incarceration, have been sentenced to 24 months or less in prison.

The government agrees that the applicable Guideline range call for a term of

imprisonment of 24 – 30 months.  That calculation explicitly takes into account Mr. Alexander's

criminal history and the circumstances of the instant offense, including that it occurred in a

public housing facility.  Nonetheless, the government seeks an upward departure to 36 months of

imprisonment, based on Mr. Alexander's criminal history and various assertions regarding the

harm done by drug trafficking that are not specific to Mr. Alexander.  The Court should decline

to depart upward because Mr. Alexander's criminal history and the protected nature of the

location are already fully accounted for in the Guidelines calculation. Any enhanced sentence based on these factors would unfairly double-count conduct that is already considered by the Guidelines calculation. Moreover, an extended term of incarceration will only further delay Mr. Alexander's access to services that give him a reasonable prospect of becoming a stable and productive member of the community, including being a positive factor in the lives of his two children. Mr. Alexander is willing to abide by the geographic restrictions and other reasonable conditions of supervised release. His half-brother, who resides in Mattapan, has volunteered to have Mr. Alexander live in his home upon his release.

Mr. Alexander fully understands and is sorry for his wrongdoing, and seeks the opportunity to begin promptly to try to rebuild his life. A sentence of time served (16 months), in addition to the six years of supervised release, is an appropriate and just sentence under all of the circumstances.

## II.      RELEVANT FACTS

### A.      Mr. Alexander's Upbringing

Mr. Alexander was born in 1980. He was raised in Boston, along with his two older half-sisters, Angela and Felicia Alexander, by his mother, Sandra Alexander. PSR ¶ 62. The family moved to 617 Shawmut Avenue in the South End of Boston in approximately 1983 after their home was destroyed by a fire. In approximately 1996, they moved to Irma Street in Dorchester. *See* Ex. 1, Felicia Alexander Letter. His mother worked hard to support Byron and his sisters, first as a bus driver and then as a dispatcher for Laidlaw Bus Company, while also receiving public assistance at times.

Byron's father, Ronald Robinson, was an immigrant from Jamaica who separated from Byron's mother when Byron was a young child, but continued to spend time with Byron

throughout his childhood.  PSR ¶ 62.  Byron's father was physically abusive to him, regularly beating Byron with belts, switches, and other objects as punishment for minor misbehavior.  PSR ¶ 63.  Byron's sisters have vivid memories of the abuse he suffered, including whippings by his father.  Ex. 1, Felicia Alexander Letter.  Byron also has a half-brother on his father's side, Kobina Adeniji, who moved to the United States from Jamaica when Byron was three years old and Kobina was seventeen.

Byron attended McKinley High School in the Fenway neighborhood and stayed in school until age 17, when he left school as a result of the criminal convictions discussed below.  PSR ¶ 87.  Byron suffered from emotional issues as a result of the physical abuse from his father, and that abuse took a heavy toll on his mental and emotional development.  Ex. 2, Angela Alexander Letter.  Byron's half-brother recalls that Byron's home was unstable and that, even as a young child, Byron was "mostly on his own."  Ex. 3, Kobina Adeniji Letter.

Byron is part of a large, extended family, many of whom have written to the Court concerning sentencing.  *See* Exs. 1 – 16.  His half-brother, Mr. Adeniji, now works as a counselor at the Dimock Center in Roxbury, and has remained fairly close to Byron over the years.  Ex. 3, Kobina Adeniji Letter.

Byron also has several cousins and aunts who were part of his life growing up, who have written to the Court concerning his sentencing.  They all recognize that Byron has struggled with poor decision-making in the past, but also have seen the efforts he has made to change his life and take responsibility for his actions.  *See, e.g.*, Ex. 9, Shaun Davis Letter; Ex. 10, Veronica Davis Letter, Ex. 7, Ruby Hudson Letter.

**B.**     **Adolescent Offenses and Incarceration**

In March 1997, five days after he turned 17 years old, Byron and two other teenagers robbed an individual, and Byron was identified as having drawn a knife during the encounter. They stole items of minimal value – a coat, hat, and a CD.  PSR ¶ 44.  The victim's nose was broken during the incident; however, no one has suggested that Byron was the person who broke it.  *Id.*

Two months later, when he was still 17, Mr. Alexander and another teenaged friend got into a dispute with another teenager from the neighborhood.  Mr. Alexander's friend intervened in the dispute, pulled a knife, and stabbed the victim in the leg.  The victim subsequently died from the wound.  PSR ¶ 45.  Mr. Alexander was tried as an adult in 1998 and convicted of Second Degree Murder.  However, that conviction was later set aside by the trial court and reduced to involuntary manslaughter.  In 2001, Mr. Alexander was resentenced to 10-15 years in prison on the reduced manslaughter verdict, and served that sentence.  *Id.*

After his conviction, Mr. Alexander pled guilty to adult Armed Robbery and Assault by Means of a Dangerous Weapon ("ADW") charges arising from the March 1997 robbery noted above.  Mr. Alexander was sentenced to four to five years on these charges, running concurrent with his sentence for the manslaughter conviction.  PSR ¶ 44.

As a result of those offenses, Byron was incarcerated for the remainder of his teenage years and essentially all of his 20's – from the time of his arrest in 1997 at the age of 17 until 2009, when he was 29.  He had a number of disciplinary incidences during his first five years in prison, but after the age of 25, his disciplinary incidents were few and relatively minor.  He worked to improve himself while in prison, ultimately earning his way into a minimum-security

placement.  He took classes in prison and received his GED.  PSR ¶ 87.  He also was employed

at a number of different jobs while incarcerated, including as a clerk, in the kitchen, as a referee,

and on an outside work crew.  PSR ¶ 96.  The end of his sentence was served in a pre-release

facility, where he worked on a loading dock repairing pallets.  PSR ¶ 95.

### C.   Mr. Alexander's Sarcoidosis

At the age of 21, while in prison, Mr. Alexander was diagnosed with sarcoidosis, a

serious, chronic condition that results in inflammation of his lymph nodes and has affected many

of his other organs.  PSR ¶ 79.  At one point, he was considered for a pacemaker due to his

symptoms.  His sarcoidosis frequently leaves him severely fatigued, and it has interfered with his

ability to work jobs requiring physical labor over extended time periods.  PSR ¶¶ 79, 89.

### D.   Mr. Alexander's Life Since His Release In 2009

After being released from prison on parole in 2009 at age 29, Mr. Alexander lived with

his mother, Sandra Alexander.  Soon thereafter, he enrolled in an HVAC certification program at

Kaplan Career Institute, PSR ¶ 87, and attended the program for approximately 16 months, but

left when it became clear he was taking on too much debt and it was unclear he would find

employment when he completed the course.

Mr. Alexander held numerous jobs in the years after his release, including working while

he attended Kaplan.  Ex. 16, Kaplan Transcript.  They included:

- In early 2011, he worked at PriceRite Supermarket.  Ex. 15, Employment Verification Letter from PriceRite.

- From May of 2011 to March of 2012, he worked on the loading docket at Lowe's Home Improvement in Dedham for ten months.  Ex. 14, Employment Verification Letter from Lowe's.

- From January to July of 2013, he worked as an attendant and fitness instructor at Planet Fitness in Mattapan.  One Planet Fitness customer has written a letter in support of Mr. Alexander, describing how he worked closely with her on a weight

loss program and helped her and her family through a relative's death.  Ex. 11, Antonia Andrade Letter.

- He worked several construction jobs, including a highly paid job installing solar panels for a contractor.  PSR ¶ 92.

- From December of 2014 to June of 2015, he worked at Phoenix Construction Company, headquartered in Winchester.  Joseph Rekowski, Byron's supervisor, has submitted a letter offering that Byron was a "good employee with a positive attitude" who was missed when he left the company.  Ex. 13, Joseph Rekowski Letter.

In short, from at least 2009 through mid-2015, Mr. Alexander made persistent efforts to find work and keep himself gainfully employed and sought to raise his skill levels, despite several difficulties – including his criminal record,[1] health limitations, and some serious emotional issues he began to experience when his mother passed away from cancer in 2013.

In his personal life, in 2011, Mr. Alexander had two children, a son and a daughter, both of whom are now five years old.[2]  As evidenced by the letters submitted by both mothers and by his daughter, Mr. Alexander has had a close relationship with both children since birth, and still communicates with them through their mothers.  Jennifer Fontes, the mother of Byron's daughter, states:

> Byron was very active in [his daughter]'s life.  He would take her to swim classes, basketball class, to the park and many outings.  Their favorite past time was walking around Castle Island and looking to see what different things they could find in the sand.  [She] constantly talks about their beach days.  Byron would pick [his daughter] up from my house and bring her to school as well as picking her up from and dropping her off home later.  Ex. 4, Jennifer Fontes Letter.

Staisha Stephens-Brown, the mother of Byron's son, notes that:

> Byron's commitment to our son was and continues to be unwavering.  Byron has been a huge presence in our son's life.  He picked him up from school, enrolled him in basketball and swimming at our local YMCA, provided me help with food and clothing

---

[1]     For example, in 2013, Mr. Alexander completed the on-boarding process for a medical waste sterilization job at Massachusetts General Hospital, but was let go because a background check conducted by the Hospital reflected his 1997 manslaughter conviction – which at the time was erroneously still reflected in his record as second degree murder.  PSR ¶ 90.

[2]     Their names are omitted for privacy reasons.

costs regularly, and most of all cultivated the relationship our son has with his half-sister. Ex. 6, Staisha Stephens-Brown Letter.

Byron's absence has been difficult for his children.  Ms. Stephens-Brown notes that "[o]ur son misses his father very much.  There is not a day that goes by that he does not ask where his father is or recounts a fond memory he has of Byron." Ex. 6.  Byron's daughter also has written a letter to the Court concerning her relationship with her father (although she is unaware of these criminal charges or that her father is currently imprisoned).  Ex. 5, L.A. Letter.

Mr. Alexander also remains in contact with his half-sisters, who are, respectively, a medical assistant and a pharmaceutical warehouse worker, and both of whom reside with their families in neighboring apartments in Pawtucket, Rhode Island.  He is also in regular contact with his half-brother, Mr. Adeniji, who has offered to have him stay in his home upon his release from prison until he if established financially.  PSR ¶¶ 68-69, 71.

### E.    Mother's Death and Related Mental Health Issues

Following his release from custody in 2009, Mr. Alexander slowly adjusted to life outside prison.  He generally sought to avoid old friends and acquaintances and worked to secure employment.  Byron's mother, Sandra Alexander, was diagnosed with cancer when Byron was a teenager and was treated successfully, but the cancer returned in 2011.  Mr. Alexander became deeply involved in his mother's care, accompanying her to medical appointments and helping her at home.  Mrs. Alexander ultimately died of cancer in 2013.

His mother's death struck Mr. Alexander especially hard, and he began to suffer from depression.  Mr. Alexander's family members describe in their letters the severe impact her death had on him, tying it to his having been imprisoned for so many years and then losing her relatively shortly after his release.  His sister, Angela Alexander recalled:

> Byron suffered the greatest los[s] when our mother passed away.  Being that he was very close to our mother and cherished the little time he had with her he took her death very hard.  The things he enjoyed doing didn't seem to interest him anymore. Ex. 2.

Similarly, his cousin, Veronica Davis, states:

> I believe Byron is suffering from depression and major emotional issues due to my aunt Sandra Alexander's passing, her death lead to him making poor decisions. . . .  Byron's mom's death really brought him to a dark place in which he stayed despite desperate attempts to overcome. Ex. 10.

Finally, Byron's aunt, Lila Frierson, explains:

> Byron was beside his mother, every day [and] night whe[n] he was off work until . . . [w]hen she passed.  Byron wouldn't leave the hospital until they [took] her body crying saying he couldn't believe that she was gone. Ex. 8.

Through his half-sister Felicia Alexander, who has worked in the medical field for eighteen years, Byron sought out psychological help to address his depression.  He was treated by a therapist and was prescribed medication.  PSR ¶ 81.  However, Byron experienced serious emotional problems after his mother's death, ultimately leading him into substance abuse and bringing him into contact with drug dealers in the community.

### F.  Recent Criminal Matters

In the seven years following his release from prison, Mr. Alexander had a single criminal conviction before the instant offense – as well as a second conviction that was recently vacated because of insufficient evidence.[3]  The only conviction that remains is an assault and battery charge resulting from an altercation with his girlfriend in August 2014.  Byron admitted to the police that he had grabbed his girlfriend's arm when she was walking away from him, and a

---

[3]     After a traffic stop in August 2011, police located ten small bags of marijuana in the vehicle Mr. Alexander was driving.  He was charged with Possession of a Controlled Substance with Intent to Distribute, and pled guilty. In April 2017, the West Roxbury District Court vacated the conviction, finding the plea lacked a "strong factual basis."  Mr. Alexander also had a continuance without a finding ("CWOF") for driving on a suspended license which stemmed from a September 2013 incident.  He received approximately a month of probation for this incident. This CWOF resulted in no additional criminal history points.  PSR ¶ 47.

witness reported that he slapped her with his open hand.  He was charged with Assault and

Battery and pled guilty to a sentence of one year of probation.[4]  PSR ¶ 48.

### G.    The Instant Offense

On December 1, 2015, Mr. Alexander was contacted by an ATF informant, who set up a

sale of crack cocaine in the informant's apartment in the Lenox Street Projects.  Mr. Alexander

sold the informant 15 pieces of crack cocaine for $180.  PSR ¶¶ 13, 17.  Shortly after the sale,

Mr. Alexander was arrested in the same neighborhood on an unrelated warrant.  Crack cocaine

was also recovered from him after his arrest – this additional crack cocaine was the basis for

Count II of the indictment.  PSR ¶ 22.  It is not alleged that Mr. Alexander had any weapons in

his possession at the time of the sale, and no weapons were located on him after his arrest.

### H.    Objections to Relevant Portions of Presentence Report

While Mr. Alexander admits the core of the charged conduct here, he timely objected to

and contests several of the government's fact allegations regarding the instant offense as

submitted for purposes of the Presentence Report.[5]  Specifically,

- Mr. Alexander did not "resist" arrest following the sale to the informant and there
  was no "struggle" with the arresting officers.  PSR ¶ 21.  Tellingly, Mr. Alexander
  was never charged with resisting arrest in relation to the incident in the state court
  proceeding.  PSR ¶ 59.  This allegation is not part of Mr. Alexander's plea and he
  denies that it occurred.

- Mr. Alexander denies that the informant set up a second sale for him on December 1,
  2015.  PSR ¶ 19.  He also denies the informant's account of his having carried a
  firearm in the presence of the informant, discussed carrying a firearm with him, or led
  the informant to believe he was carrying a firearm.  PSR ¶ 40.  As Mr. Alexander
  noted in his objections to the draft PSR, both allegations are false.

---

[4]     An accompanying charge of Carrying a Dangerous Weapon– a folding knife that he used for his job at
Lowes – was dismissed.  Mr. Alexander promptly handed the knife to the police when questioned, and was not
alleged to have threatened anyone with the knife or otherwise used it.

[5]     None of these fact allegations is directly relevant to the sentencing determination.   *See* PSR, at 25-28.

- Mr. Alexander denies any gang affiliation as alleged by the government.  PSR ¶ 10 & n.1.  The inference that he is a gang member is simply false, as Mr. Alexander stated in his Presentence interview.  PSR ¶ 64.  He has no tattoos, has never been noted to (and doesn't) wear clothing identifying gang members, has never been found to have possessed a firearm, and has a history of seeking and maintaining gainful employment – all of which makes him atypical of individuals affiliated with gangs.  As the government acknowledges, he has nothing to do with the YouTube video referenced in its presentence submission depicting a group of other defendants "rapping" and smoking marijuana in the Lenox Street projects.  PSR ¶ 10 & n. 2.  He is significantly older than most of the individuals arrested in the ATF "sweep" of the Lenox Street projects, and the age difference between him and the other defendants makes it improbable that he is a gang affiliate of theirs.

- Mr. Alexander was unaware that he was on the Boston Housing Authority's no trespassing list.  PSR ¶ 10 & n. 2.  He has never been arrested for trespassing.

- The government alleges that when Mr. Alexander was arrested after the instant offense, he possessed $150 of "suspected counterfeit bills."  PSR ¶ 22.  Mr. Alexander does not believe that the money he possessed was counterfeit and has never been involved with counterfeiting.

## III.   SENTENCING ANALYSIS

### A.   Guidelines Analysis

The parties and Probation Office agree that Mr. Alexander has an offense level of 13 and nine criminal history points, placing him in Category IV, with an applicable Guideline range of 24-30 months.  This calculation fully accounts for the characteristics of this offense and his prior criminal record.  For reasons explained in detail below, the § 3553(a) factors support a sentence of time served, effectively five months below the low end of the applicable range (assuming credit for good time).  Because Mr. Alexander was convicted of violating 21 U.S.C. § 860, the mandatory term of six years of supervision is an integral part of his sentence.  Thus, a sentence of time served would mean that he will have either been in custody or federal supervision for approximately seven and a half years after the offense.

**B.      Relevant Factors Under Section 3553(a)**

**1.      The 18 U.S.C. § 3553 Factors Support a Sentence of Time Served Followed by Six Years of Supervised Release.**

The Guidelines calculation is only the beginning of the sentencing analysis: "the sentencing judge consider[s] every convicted person as an individual and every case as a unique study of human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)).[6]  The relative weight to be assigned to each Section 3553(a) factor depends on the circumstances of each case.  *United States v. Dixon*, 449 F.3d 194, 205 (1st Cir. 2006).

An 18-month sentence, six months below the low-end of the applicable range, is "sufficient, but not greater than necessary, to comply with the purposes" of Section 3553(a)(2).  Coupled with the mandatory six years of supervised release pursuant to 21 U.S.C. § 860(a)(2), Mr. Alexander will have been incarcerated or under close supervision for seven and a half years from the date of his arrest.

a.      The Nature and Circumstances of the Offense

While Mr. Alexander's offense was serious, his behavior falls on the low end of the spectrum of conduct prohibited by 21 U.S.C. §§ 860 and 841(a)(1).  Mr. Alexander's conviction involves the events of a single day, and the sale of a relatively modest amount of narcotics to a

---

[6]      Neither the Government nor the Probation Office argues that Mr. Alexander qualifies as a career offender.  However, to the extent the PSR suggests such an analysis may be appropriate (see PSR n. 5), neither ADW nor assault and battery, as defined by Massachusetts law, is a predicate offenses because neither offense requires the degree of force necessary to be considered a "crime of violence." Specifically, an individual may be convicted of ADW where he merely "attempts" or "threatens" the slightest touching of another with a dangerous weapon. *See Commonwealth v. Appleby*, 380 Mass. 296, 306-07 (1980).  Similarly, a defendant may be convicted of A&B for offensive or reckless battery, neither of which qualifies as a "crime of violence" under §4B1.2(a)(1).  *See United States v. Halloway*, 630 F.3d 252, 262 (1st Cir. 2011); *United States v. Aponte*, 208 F. Supp. 3d 347, 349 (D. Mass. 2016) (Ponsor, J.) (concluding that conviction for simple A&B is not a career offender predicate post-*Johnson*).  Neither offense, as defined in Massachusetts, meets the definition of violent force required to be a career offender predicate. *See Johnson v. United States*, 559 U.S. 133, 140 (2010).

single individual.  The buyer, a government informant, was an adult who Mr. Alexander had no

reason to think was particularly vulnerable.

     The narcotics were sold in housing project, a protected area, but it was the informant who

contacted Mr. Alexander to arrange the transaction and location.  PSR ¶¶ 13, 15.  The sale was

conducted in a private residence, not in public view.[7]  As discussed above, the Guidelines

calculation accounts for the protected area by adding an additional point to the offense level.

PSR ¶¶ 28-30, U.S.S.G. §2D1.2(a).

     **b.**    <u>The History and Characteristics of the Defendant</u>

     Mr. Alexander asks that the Court consider four aspects of his personal history and

characteristics as favoring the requested sentence.  18 U.S.C. § 3553(a)(1).

     First, there have been adverse experiences in Byron's life that have contributed to (while

not excusing) his past criminal behavior.  As noted, he suffered serious physical abuse as a child.

PSR ¶ 63, Ex. 2, Angela Alexander Letter.  The repercussions of this abuse continued to affect

Mr. Alexander through his teens and early twenties, and to a lesser degree in recent years.  It is

worth noting, though, that while he has had a number of violent incidents in his past, he has

stayed away from firearms.  The Court should also consider the extent to which his mother's

death had a sharply negative impact on Mr. Alexander after 2013, sending him into a tailspin in

the period leading up to his offense.  He will benefit from sustained mental health treatment

while on supervised release.

---

[7]     The Government suggests that Mr. Alexander's conduct is tied to the "high concentration of violence in and around Lenox Street" as well as "groups [who] literally take over hallways and courtyards inside Lenox Street in order to use drugs and hang out."  But the Government has no information suggesting that Mr. Alexander has a history of possessing a firearm, that he routinely loiters at the Lenox Street Development, or that he is involved in any alleged gang activity.

Second, both leading up to and after Mr. Alexander's release in 2009, he showed a genuine commitment to being a productive member of the community. PSR ¶¶ 89-94. He took advantage of educational opportunities and vocational training while in state prison, participated in violence reduction programming, and worked at a variety of prison jobs. PSR ¶¶ 82, 87, 95-96. When Mr. Alexander was released from prison at the age of 29, he enrolled in vocational training (HVAC installation and repair), Ex. 16, Kaplan Letter, and was employed at several jobs for extended periods of time. One of Mr. Alexander's customers at Planet Fitness notes his "positive, encouraging, and motivating" attitude, as well as Mr. Alexander's dedication to his family and the community. Ex. 11, Antonia Andrade Letter.  In the seven years after his release in 2009, Mr. Alexander's only criminal conviction was a misdemeanor assault and battery, for which he was sentenced to a year of probation.

Third, Mr. Alexander has a large, supportive family and close friends who have stood by him through his current issues and will be an important support network when he is released. His sisters and half-brother are excellent role models who are hard workers and gainfully employed, and important supporters as he seeks to rebuild his life during the six-year supervised release period.

Fourth and finally, Byron is a devoted father to his two young children. Before his arrest on this offense, he saw his children almost daily, and contributed financially to their support to the extent he was able. PSR ¶ 75; Ex. 4, Jennifer Fontes Letter; Ex. 6, Staisha Stephens-Brown Letter. Both of his children's mothers are college-educated, and they are still in close touch with each other and with Mr. Alexander. Mr. Alexander has strived to maintain a relationship with his children despite being incarcerated. Mr. Alexander understands what a hardship his

incarceration has been for his children, and he is motivated to remain in their lives going forward.

Mr. Alexander is genuinely remorseful and is eager to take advantage of the treatment and vocational opportunities he will have access to while on supervised release and establish a stable life once he has completed his sentence.  An extended prison sentence will do nothing toward the goal of enabling Mr. Alexander to move toward being a responsible member of his family and his community.

c.      The Need to Afford Adequate Deterrence and Protect the Public

A sentence of time served followed by six years of supervised release is fully adequate to deter others from similar misconduct and protect the public from Mr. Alexander reoffending.  18 U.S.C. § 3553(a)(2)(B), (C).  Mr. Alexander would agree to be excluded from the Lenox Street Projects and surrounding neighborhood and will be closely supervised for six years, or until the approximate age of 43.  By that time, Mr. Alexander would be well beyond the age where he would pose a high risk of recidivism.  *See*, Ex. 17, R. Sampson & J. Laub, *Life-Course Desisters?  Trajectories of Crime Among Delinquent Boys Followed to Age 70*, 41 CRIMINOLOGY, no. 3, 2003, at 569 (finding "[t]here is little ambiguity that all crimes eventually decline with age" and that the mean age of desistance for alcohol and drug offenses is 37, Byron's current age).  He understands that any lapse after he is released would have severe consequences.

d.      The Need to Provide Education or Vocational Training, Medical Care, or Other Treatment

Mr. Alexander hopes to take advantage of  substance abuse, mental health counseling, and vocational training while he is on supervised release.  U.S.C. § 3553(a)(2)(D).  Those services, which he did not have access to when released from the state system, will assist Mr.

Alexander in his post-release transition.  The optimal outcome for both him and the community would be for him to complete his incarceration forthwith and proceed to an extended period of supervised release with access to such training and treatment.

        e.        <u>The Need to Avoid Unwarranted Sentencing Disparities</u>

Judges may consider the sentences of other defendants arrested in the same investigation when determining the appropriate sentence.  18 U.S.C. § 3553(a)(6); *see United States v. Jones*, 762 F. Supp. 2d 270, 283 (D. Mass. 2010).  The Lenox Housing Projects "sweep" in which Mr. Alexander was arrested and charged included some 18 other defendants.  Several of those defendants committed offenses generally similar to Mr. Alexander – selling small amounts of narcotics and/or other contraband to the same ATF informant placed in the Lenox Street Projects.  Most of the other defendants have been sentenced to between 12 and 24 months' imprisonment, including five who were sentenced at or very close to the one-year mandatory minimum for 21 U.S.C. § 860[8] and five others who were sentenced to 24 months or less in prison.  The specific cases and sentences are noted below and in Appendix A.[9]

Significantly, many of these defendants have several prior convictions.  For example, this Court sentenced James Richardson to 24 months imprisonment and 48 months of supervised release after he pled guilty to a superseding information that dropped the § 860 enhancement.  Mr. Richardson had previously been convicted of a federal firearms charge for which he served 15 years in prison, as well as assault and battery on a police officer.  *United States v. Richardson*,

---

[8]     *See United States v. Bryant*, 16-CR-10080 (12 months and 1 day) (Woodlock, J.); *United States v. Depina*, 16-CR-10067 (13 months) (Saylor, J.); *United States v. Hills*, 16-CR-10071 (12 months) (Zobel, J.); *United States v. Melo*, 16-CR-10073 (12 months and 1 day) (Saris, J.); *United States v. Parham*, 16-CR-10065 (12 months and 1 day) (Woodlock, J.).

[9]     *See United States v. Bogarty*, 16-CR-10079 (24 months) (Zobel, J.); *United States v. Stephen Freeman*, 16-CR-10076 (21 months) (Casper, J.); *United States v. Santos*, 16-CR-10078 (18 months) (Gorton, J.); *United States v. Richardson*, 16-CR-10070 (24 months) (Wolf, J.); *United States v. Tolbert*, 16-CR-10069 (16 months) (O'Toole, J.). *See also United States v. Hasberry*, 16-CR-10123 (time served – 21 days – and three years of supervised release after guilty plea to § 841(a)(1)) (Casper, J.).

16-CR-10070, Dkt No. 51, at 2; Dkt. No. 52-1.  Similarly, Hassan Parham, who was ultimately

sentenced to 12 months and a day in prison, had prior convictions for armed assault with intent to

rob, ABDW, possession of a firearm, and threatening to commit a crime.  He had spent eight to

nine years incarcerated.  *See United States v. Parham*, 16-CR-10065, Dkt. No. 45, at 11.

Mr. Alexander's criminal history is on par with several of the other defendants in this

sweep.  A sentence of  18 months of imprisonment (resulting in time served, accounting for

credit for good time) is in line with the sentences imposed on other comparable defendants, and

thus avoids any unwarranted disparity in sentencing.

### C. The Court Should Not Impose an Above-Guidelines Sentence.

The Government argues that the court should sentence Mr. Alexander above the

Guidelines range, citing Mr. Alexander's criminal history and other factors.  These factors,

however, are already fully accounted for in the Guidelines analysis, and imposing an above-

Guidelines sentence for those reasons would effectively double-count issues that are already

taken into consideration by the Sentencing Guidelines and applicable range.

### 1. The Guidelines Account for the Offense Having Occurred in a Public Housing Project.

The Government first argues that the court should depart upward because Mr. Alexander

sold drugs in a public housing development, and therefore contributed to the negative effects of

drug trafficking felt in public housing.  *See* Gov't Mem. at 2-9.  But U.S.S.G. Section 2D1.2(a)

as applied here already accounts for the protected area by increasing his offense levels by one

level to take into account that the offense occurred in a public housing project.  *See* PSR ¶ 30 &

n. 4.  Further, he will be subject to a mandatory six-year period of supervised release by virtue of

his conviction under 21 U.S.C. § 860.  Consequently, the Guidelines range fully takes into consideration the protected location at which the sale occurred. [10]

> **2.      The Guidelines Account for Mr. Alexander's Criminal History.**

The government also argues that Criminal History Category IV understates the significance of Mr. Alexander's criminal history.  Gov't Mem at 11-13.  But the Guidelines calculation already appropriately accounts for Mr. Alexander's criminal history and any non-compliance with previous criminal justice obligations.  In fact, the majority of Mr. Alexander's criminal history points stem from two offenses he committed at the age of 17, for which he was tried as an adult.  PSR ¶¶ 44-45.  Additionally, two points already have been added to his calculation to account for the fact that Mr. Alexander committed the instant offense while on probation.[11]  *Id.* at ¶ 50.  Consequently, the Guidelines already fully account for the most serious offenses in Mr. Alexander's criminal history as well as his previous probation violation. Departing upward based on his criminal history would again be double-counting factors that already have increased his sentence.

The government's argument that he should be sentence more severely because of supposed evidence that he was engaged in drug distribution on a wider scale (Gov't Mem at 10) should receive no weight, since the same can be said in every drug distribution case and would destroy the whole purpose behind tying drug sentences to the drug weights involved in the offense.  Similarly, the claim that his sentence should be higher because he was *not* a crack cocaine user (*id.* at 10) is nonsensical – it happens that Mr. Alexander was battling other substance abuse issues at the time, but in any event there is no basis to increase a sentence where

---

[10]     Further, as the government acknowledges, the transaction took place at the Lenox Street Development because the government's informant invited Mr. Alexander to his apartment in the development.  *Id.* at n.7.

[11]     The Government incorrectly asserts that Mr. Alexander was "on probation for Assault and Battery and a Weapons offense;" however, the charge of Carrying a Dangerous Weapon – a knife Mr. Alexander used for his job and Lowe's, and which he promptly handed to police when questioned – was dismissed.  PSR ¶ 48.

a defendant was not a user of the particular controlled substance that was the subject of the offense.

### 3.    An Enhancement Under § 4A1.3 is Inappropriate.

Finally, the Government specifically argues that an upward departure is warranted under § 4A1.3 because Mr. Alexander has two "prior sentences of substantially more than one year imposed as a result of independent crimes committed on different occasions." Govt. Mem. at 12. The Sentencing Commission's guidance, however, instructs that such a departure is only to be used in "limited circumstances" where the "criminal history category does not adequately reflect the seriousness of the defendant's criminal history." U.S.S.G. § 4A1.3, Application Notes. One instance where an upward departure based on criminal history could be appropriate is with "younger defendants . . . who are more likely to have received repeated lenient treatment." *Id.*

Here, however, just the opposite is true – Mr. Alexander served lengthy sentences for the crimes he committed as a teenager, and those offenses are already taken into account by his criminal history score (even though today, a 17-year-old could not be tried as an adult for the ADW charge). *See Watts v. Commonwealth*, 468 Mass. 49, 50-51 (2014); MASS. GEN. LAWS c. 119, § 74. Because of the exclusion of his state prison time in determining convictions that may be included in the criminal history computation, the Court is considering offenses from his teenage years, more than 20 years ago, already are affecting his Guideline range. The Guideline range as calculated here appropriately accounts for the seriousness of Mr. Alexander's criminal history. Any upward departure is unnecessary and uncalled for under the Guidelines, nor is it warranted by the relevant factors under Section 3553 .

## IV.   CONCLUSION

A sentence of time served, followed by the mandatory six-year term of supervised release, is fully adequate to meet the goals of federal sentencing under 18 U.S.C. § 3553(a) and fully accounts for both the charged conduct and Mr. Alexander's criminal history.  .

                          BYRON ALEXANDER,

                          By his attorneys,


Dated:  August 4, 2017                 /s/ John J. Falvey, Jr.
                          John J. Falvey, Jr. (BBO #542674)
                          Kelly Vaughan Husid (BBO #684516)
                          Goodwin Procter LLP
                          100 Northern Avenue
                          Boston, MA  02210
                          Tel: (617) 570-1000
                          Fax: (617) 523-1231
                          jfalvey@goodwinlaw.com
                          khusid@goodwinlaw.com

                          *Attorneys for Byron Alexander*


## CERTIFICATE OF SERVICE

I, John J. Falvey, Jr., hereby certify that the foregoing document, filed through the CM/ECF System, will be sent electronically to those indicated as registered users on the Notice of Electronic Filing  ("NEF") and paper copies will be sent to those indicated as non-registered user this 4th day of August, 2017.

                          /s/ John J. Falvey, Jr.